# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4144-17T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

G.P.T.,[1]

     Defendant-Appellant.

_____

Argued telephonically May 28, 2020 –
Decided  June 26, 2020

Before Judges Fuentes, Haas and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Warren County, Indictment No. 16-06-0259.

Peter Anthony Gaudioso, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Peter Anthony Gaudioso, on the briefs).

Dit Mosco, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent

---

[1] We use initials to protect the privacy of the victim. R. 1:38-3(c)(12).

(James L. Pfeiffer, Acting Warren County Prosecutor, attorney; Dit Mosco, of counsel and on the brief).

PER CURIAM

Defendant G.P.T. appeals from his conviction for second-degree endangering involving sexual conduct with a child by a caretaker, N.J.S.A. 2C:24-4A(1) (count one), second-degree endangering involving abuse or neglect of a child by a caretaker, N.J.S.A. 2C:24-4A(2) (counts two), and fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b) (count three).[2] He also challenges his April 12, 2018 sentence as excessive. The victim of the sexual abuse was defendant's biological daughter. We affirm defendant's conviction and sentence.

On September 12, 2015, defendant's sixteen-year-old daughter, E.T., was at his home for a visit. She asked for a cigarette and then asked for marijuana. At first defendant refused E.T.'s request for marijuana but when she asked a second time, defendant offered her marijuana in exchange for her performing fellatio on him. According to E.T.'s testimony, defendant "mentioned something about giving [E.T.] oral sex too." E.T. further testified that her father had "said

---

[2] Defendant also was charged with the disorderly persons offenses of possession of under fifty grams of marijuana, N.J.S.A. 2C:35-10(a)(4) and possession of drug paraphernalia, N.J.S.A. 2C:36-2. The State dismissed the marijuana possession charge at trial and defendant was found guilty of the paraphernalia charge during a contemporaneous bench trial. The paraphernalia conviction is not challenged in the instant appeal.

something about [fellatio] before, but this time it was different," because "[h]e was really persistent." When asked by the prosecutor to explain how defendant was persistent, E.T. affirmed:

> He said you don't have to look at me. You don't have to think of me as your dad. And he mentioned I could put on a porn video to like make myself comfortable. And he said that if I did it he would give me weed and we would smoke before and after.

E.T. also testified that defendant gave her an alcoholic drink consisting of coconut rum and cranberry juice. After she drank the cocktail, she told her father she would "go through with it." Defendant retrieved his laptop computer and E.T. followed her father upstairs to his bedroom. Defendant put the laptop on his bed, filled a pipe with marijuana and gave it to E.T. He also entered a password on his laptop so E.T. could access a pornographic website and download a video. E.T. testified that she smoked the marijuana, downloaded a video titled, "'Step[-]Dad Teaches Daughter Sex' or something," and defendant laid down next to her on the bed. E.T. felt her father's "hard" penis touching her buttocks. Additionally, she affirmed he touched her breast and buttocks with his hands but when he tried to place his hands down her pants, she told him she "could not go through with it." Defendant then got up and left the bedroom.

3

E.T. remained in her father's bedroom and again smoked marijuana but "tried to stay away" from her father until her mother picked her up the next day. She admitted she stayed overnight at her father's home because she "didn't want to get the cops involved," and was scared to tell her mother. However, E.T. used Facebook Messenger on September 12, 2015 to tell a social media acquaintance about the incident. The next day, she told her mother and her friend, T.F., about what happened.

E.T. was interviewed by the local prosecutor's office on September 14, 2015. Thereafter, a detective obtained a search warrant for defendant's residence. When the search warrant was executed, the police found and seized two laptops, an open can of cranberry juice, a metal smoking pipe, a grinder, flakes and residue of a green vegetation.

Following the execution of the search warrant, defendant was interviewed by the police. He denied watching any pornographic materials on his computer on September 12, 2015 and stated he did not provide marijuana to his daughter. He also denied directing E.T. to watch a pornographic video, asking her to perform fellatio, or touching her inappropriately.

The State obtained a Communications Data Warrant and arranged for a forensic analysis to be conducted on defendant's two laptops. The analysis

established that one of the laptops was used to access a pornographic website on September 12, 2015 and that the video, "Stepdad Gives Sex Lessons to Stepdaughter" was accessed with a password, as well as a username identical to defendant's first name.

Prior to trial, the State moved to admit the statements E.T. made to her Facebook Messenger acquaintance and to T.F. At the testimonial hearing, defense counsel objected to the admissibility of these statements but acknowledged, "[w]ith respect to [T.F.], I would concede that . . . was more indicative of a relationship of a confidant[e] to the extent that [T.F.] indicated that she was more comfortable driving to [E.T.'s] home to have a personal communication with [E.T.] because of the nature and sensitivity of the information being disclosed." Similarly, T.F. testified she and E.T. regularly communicated on Facebook, talked on the phone and would "hang out" together. The motion judge deemed the statement to the Facebook Messenger acquaintance inadmissible but found E.T.'s statement to T.F. was admissible because it was made voluntarily, spontaneously, within a reasonable time after the alleged assault and to a person who qualified as a "natural confidante."

At trial, T.F. testified that on September 13, 2015, E.T. reached out to her through a private message on Facebook and told her "something bad had

happened and she wanted to talk about it."  When asked on direct examination to recall what E.T. told T.F., T.F. stated she "need[ed] a second to like look at this," referring to a statement left on the witness stand.  The prosecutor apologized for inadvertently leaving another witness's statement on the stand and asked, "are you having a hard time remembering exactly what [E.T.] said?"  T.F. responded, "[y]eah, it was so long ago."  T.F. was given a copy of her own statement to a detective and confirmed it helped to refresh her recollection.  Immediately thereafter T.F. testified that E.T.

> told me that she had gone to her dad's the night before and that he had asked her to perform oral sex on him. And I said okay. . . .  And she just - - I don't really remember what you know she said after that.  There might have been like a pause.  And then she said that you know I want to tell something that like I didn't tell anybody else.  Because she had said that she had told her mom and that you know that it was going to be taken care of.  But she said you know I need to tell you more. And she had said that like when he asked she didn't want to upset him so she did go upstairs with him.  And he told her to put on porn.  And that she like laid down with him.  And then it stopped after that.  Soon after that.

Without objection from defense counsel, T.F. was asked if E.T. told her defendant touched her inappropriately.  T.F. responded, "[t]hat he had put like his hand on her breasts."  Next, the prosecutor asked if E.T. told T.F. "anything about cigarettes and alcohol."  T.F. replied, "[y]es.  So she had told him to stop,

6

and the interaction did stop. But she said that he'd . . . tried to bribe her with like cigarettes and alcohol if she . . . wanted whenever she would come see him, because she was only sixteen then."

Once the trial concluded, the jury was excused for deliberations. A little over an hour into deliberations, the jury advised the trial court it had a number of questions, including questions about T.F.'s testimony. The jurors were dismissed for the day. When the trial resumed, one of the jurors did not appear due to illness, so both attorneys agreed to excuse the sick juror and replace her with an alternate. Since a new jury was empaneled, the trial judge and counsel agreed the first jury's pending questions need not be addressed.

During discussions with counsel, the judge realized he did not instruct the jurors about how they should consider T.F.'s fresh complaint testimony. Counsel offered their input as to how to handle this new instruction. Both attorneys expressed concern that the newly-formed jury might pay "inordinate attention" to the isolated instruction. The judge agreed this was a "legitimate concern" and advised he would caution jurors not to "single [the instruction] out for emphasis." Counsel assented to the judge reading the fresh complaint instruction to the jurors without having to re-read all the instructions they heard after testimony had concluded.

A-4144-17T1

The judge subsequently explained to the jury that a juror had been excused for reasons "personal to her." He then provided the fresh complaint instruction to the newly-formed jury, which included the following prefatory comments:

> I realized through inadvertence . . . on my part as I was reading the jury instructions for you . . . I skipped over one of the instructions. That's a big whoops.
>
> But it is one which can be remedied now because we have a new jury panel.
>
>         . . . .
>
> A fresh complaint is not evidence that the sexual offense actually occurred. That may sound counterintuitive but that's the rule. That's the rule of law.
>
> A fresh complaint is not evidence that the sexual offense actually occurred or that [E.T.] is credible. It merely serves to negate any inference that because of her assumed silence the offense didn't occur.
>
> It does not strengthen her credibility. It does not prove the underlying offense or the underlying truth of the sexual offense. A fresh complaint only goes to dispel any negative inference that might be drawn from her assumed silence.
>
>         . . . .
>
> In this context you may consider the timeliness of the complaint and the likelihood that [E.T.] would complain under the circumstances described.

8

If there was a delay in making the complaint, you may consider whether any circumstances existed which would explain the delay.

. . . .

It is of course up to you to determine what the facts are with regard to the circumstances of the complaint and what weight to give these facts in determining whether or not a complaint was made.

. . . .

Now important, because I gave you the fresh complaint instruction separately . . . does not mean it is more important than the other instructions.

[(Emphasis added).]

The jurors commenced deliberations thereafter and continued deliberating throughout the day on Friday, December 8, 2017. When the trial court reconvened on Monday, December 11, 2018 to resume jury deliberations, defense counsel advised the judge that "having had the benefit of the weekend to consider the effect of isolating the jury instruction as it pertains to [the] fresh complaint witness, I believe that it is prejudicial to the defense." Defense counsel added that "timeliness of [E.T.'s] reported abuse was never disputed because . . . we're not talking about a week or a month later, we're talking about the very next day." Based solely on these belated concerns, defense counsel

moved for a mistrial. His application was denied. Later that day, defendant was convicted on all three counts.

At sentencing, defendant received concurrent six-year prison terms on counts one and two, and an eighteen-month sentence on count three, concurrent to counts one and two. The judge found that aggravating factors two, N.J.S.A. 2C:44-1(a)(2) (the gravity of the harm to the victim) and nine, N.J.S.A. 2C:44-1(a)(9) (the need to deter) applied. Additionally, the judge found mitigating factors four, N.J.S.A. 2C:44-1(b)(4) (defendant suffered from a "chemical dependency," which failed to establish a defense, but tended to excuse his conduct) and seven, N.J.S.A. 2C:44-1(b)(7) (defendant had no significant criminal history).

On appeal, defendant presents the following arguments for our consideration:

POINT I

THE TRIAL COURT'S ADMISSION OF THE SUBSTANCE OF [T.F.'s] FRESH[]COMPLAINT EVIDENCE WAS ERRONEOUS AND WARRANTS REVERSAL.

A.   The Trial Court Should Not Have Permitted Any Fresh[]Complaint Evidence[.] (Raised Below).

10

B. The Trial Court Erred When It Concluded T.F. Was a Proper Fresh[]Complaint Witness[.] (Raised Below).

C. The Trial Court Committed Plain Error When It Permitted T.F. To Give Improper Hearsay Testimony About The Details Of The Alleged Incident[.] (Not Raised Below).

POINT II

THE MANNER IN WHICH THE TRIAL COURT GAVE THE FRESH[]COMPLAINT CHARGE CONSTITUTES PLAIN ERROR[.] (Not Raised Below).

POINT III

THE TRIAL COURT ERRED BECAUSE [DEFENDANT'S] OFFENSES ALREADY ENCOMPASSED THE AGGRAVATING FACTORS THAT THE COURT APPLIED[.] (Not Raised Below).

POINT IV

THE APPLICATION OF AGGRAVATING FACTOR 9 WAS ERRONEOUS BECAUSE THE MANDATE TO REGISTER UNDER MEGAN'S LAW[3] ALREADY ENCOMPASSES THE NEED FOR DETERRING [DEFENDANT] AND OTHERS FROM VIOLATING THE LAW[.] (Not Raised Below).

---

[3] N.J.S.A. 2C:7-1.

"Trial judges are entrusted with broad discretion in making evidence rulings." State v. Muhammad, 359 N.J. Super. 361, 388 (App. Div. 2003). As such, "[a] reviewing court should overrule a trial court's evidentiary ruling only where 'a clear error of judgment' is established." State v. Loftin, 146 N.J. 295, 357 (1996) (quoting State v. Koedatich, 112 N.J. 225, 313 (1988)). Thus, we review a trial court's decision to introduce fresh complaint testimony for an abuse of discretion. See State v. Bethune, 121 N.J. 137, 145-48 (1990).

Fresh complaint testimony involving a victim's statement about a sexual offense is admissible for the narrow purpose of "negat[ing] the inference that the victim's initial silence or delay indicates that the charge is fabricated." State v. R.K., 220 N.J. 444, 455 (2015). "[T]o qualify as fresh[]complaint evidence, the victim's statement must have been made spontaneously and voluntarily, within a reasonable time after the alleged assault, [and] to a person the victim would ordinarily turn to for support." Ibid. "A witness may testify only to the general nature of the complaint, and unnecessary details of what happened should not be repeated." State v. W.B., 205 N.J. 588, 617 (2011). The fresh complaint testimony should not be used to corroborate the victim's testimony about the offense. R.K., 220 N.J. at 456.

Defendant argues T.F.'s testimony was unnecessary because E.T. did not delay reporting defendant's offenses to her mother. Additionally, defendant contends T.F. did not qualify as a fresh complaint witness and her testimony constituted impermissible hearsay. We find these arguments unpersuasive.

Here, E.T. did not promptly report her father's offenses to law enforcement. Instead, according to her testimony, she stayed in her father's bedroom, "took another hit" of marijuana and slept overnight at her father's home. Moreover, she testified she was afraid to tell her mother what happened and "didn't want to get the cops involved." E.T. disclosed the incident to an acquaintance on Facebook who told her to call the police. She did not follow this advice and it was not until September 13, 2015 that E.T. disclosed to her mother and T.F. what occurred.

The motion judge deemed T.F.'s fresh complaint testimony admissible because he found E.T. spontaneously and voluntarily initiated contact with T.F. and that T.F. was E.T.'s natural confidante. Moreover, the motion judge was satisfied E.T.'s disclosures were made within a "reasonable time." Given the timing and circumstances of E.T.'s disclosures, as well as her friendship with T.F., we decline to find the motion judge erred in deeming T.F.'s fresh complaint

testimony admissible. Indeed, the judge's evidentiary rulings in this regard are amply supported by the record.

In Point I.C., defendant cites to R.K. to argue the trial judge plainly erred by permitting T.F. to provide fresh complaint testimony which "was highly detailed and contained the graphic details that E.T. had provided to the jury." Further, defendant contends it was plain error for the judge to allow the State to lead T.F. in her testimony and to refresh her recollection with her prior statement to law enforcement. We are not convinced.

"[W]hen counsel does not make a timely objection at trial, it is a sign 'that defense counsel did not believe the remarks were prejudicial' when they were made." State v. Pressley, 232 N.J. 587, 594 (2018) (quoting State v. Echols, 199 N.J. 344, 360 (2009)). Accordingly, a "[d]efendant's lack of objections . . . weighs against [a] defendant's claim that errors were 'clear' or 'obvious.' Indeed, '[i]t [is] fair to infer from the failure to object below that in the context of the trial the error was actually of no moment.'" State v. Nelson, 173 N.J. 417, 471 (2002) (second and third alterations in original) (quoting State v. Macon, 57 N.J. 325, 333 (1971)). "The failure to object also deprives the court of an opportunity to take curative action." State v. Frost, 158 N.J. 76, 84 (1999).

Because defendant failed to object to T.F.'s direct testimony at trial, we review the admissibility of her statements under the "plain error" standard. Pressley, 232 N.J. at 593. Under this standard, reversal is appropriate only if an error was "clearly capable of producing an unjust result." R. 2:10-2.

When a witness's memory is impaired and a foundation has been laid, he or she may view a document to refresh memory. State v. Carter, 91 N.J. 86, 122 (1982); N.J.R.E. 612. If the witness's memory has been refreshed after viewing the document, he or she may testify according to that refreshed recollection. State v. Williams, 226 N.J. Super. 94, 103 (App. Div. 1988). Here, when T.F. began to testify, she admitted to the prosecutor she was "having a hard time remembering what [the victim] said." Since T.F. recalled giving a statement to the police shortly after E.T.'s disclosure of her father's offenses, T.F. was permitted to review the statement from her police interview. T.F. then testified the recorded statement helped refresh her memory. Under these circumstances, it was not error, let alone plain error, to allow T.F. to testify about her refreshed recollection.

After T.F.'s recollection was refreshed, she testified that E.T. disclosed that her father had asked her to "perform oral sex on him," "told her to put on porn," and that she "laid down with him." T.F. also testified E.T. revealed her

15

father "had put his hand on her breasts" and "tried to bribe her with . . . cigarettes and alcohol."

Defendant argues the facts of this case are similar to those in R.K. because of T.F.'s "highly detailed" and "graphic" fresh complaint testimony, which included details E.T. had provided to the jury. He further contends that just "as in R.K., no physical evidence of an assault existed."

We find defendant's reliance on R.K. is misplaced. In R.K., the State had no physical evidence to support its case and defendant denied the allegations against him when he testified. Therefore, the State was permitted to bolster its case with several fresh complaint witnesses. Id. at 448-49. But here, there was overwhelming evidence of defendant's guilt. The record reflects that after the police obtained a search warrant, they recovered drug paraphernalia, two laptops, an open can of cranberry juice and residue from green vegetation in his home. Such physical evidence was consistent with the incident E.T. described had occurred at her father's home on September 12, 2015. Defendant also denied to police that he molested his daughter or allowed her to watch a pornographic movie. But the State conducted a forensic analysis of his laptop computers which confirmed that on September 12, 2015, a pornographic movie was accessed from one of defendant's laptops with a username identical to his first

16

name. The title of the pornographic movie was remarkably similar to that recalled by E.T. on the stand. Accordingly, even if some of T.F.'s testimony should have been excluded, we find no plain error occurred by virtue of its admission. See R. 2:10-2; R.K., 220 N.J. at 456-57.

As to defendant's newly-minted argument that T.F.'s testimony constitutes impermissible hearsay, this argument is unavailing. The fresh complaint doctrine specifically allows "evidence of a victim's complaint of sexual abuse, otherwise inadmissible as hearsay, to negate the inference that the victim's initial silence or delay indicates that the charge is fabricated." Id. at 455.

In Point II, defendant argues that the "manner in which the trial court gave the fresh[] complaint charge constitutes plain error." He specifically takes issue with the judge's remarks that "[a] fresh complaint is not evidence that the sexual offense actually occurred. That may sound counterintuitive but that's the rule." Defendant claims such comments "introduced the possibility that a fresh complaint ordinarily could be viewed as evidence that the assault actually occurred, but for the legalistic construct our courts have imposed." Again, we are not convinced.

"[P]roper jury instructions are essential to ensuring a fair trial." State v. Robinson, 165 N.J. 32, 40 (2000) (citing State v. Green, 86 N.J. 281, 287

(1981)).  "A trial court is vested with discretion in delivering the jury instructions that are most applicable to the criminal matter before it."  State v. Funderburg, 225 N.J. 66, 80 (2016) (citing State v. Ernst, 32 N.J. 567, 583-84 (1960)).  To assess the soundness of the jury instruction, an appellate court considers "how and in what sense, under the evidence before them, and the circumstances of the trial, would ordinary . . . jurors understand the instructions as a whole."  State v. Savage, 172 N.J. 374, 387 (2002) (alteration in original) (quoting Crego v. Carp, 295 N.J. Super. 565, 573 (App. Div. 1996)).

"When a defendant fails to object to an erroneous or omitted limiting instruction, it is viewed under the plain-error rule, Rule 2:10-2."  R.K., 220 N.J. at 456.  "Thus, the error will be disregarded unless a reasonable doubt has been raised whether the jury came to a result that it otherwise might not have reached."  Ibid. (citing State v. Daniels, 182 N.J. 80, 95 (2004)).  If "the State's case is particularly strong, any fresh[]complaint instruction errors may be deemed harmless."  Ibid. (citing State v. Tirone, 64 N.J. 222, 227 (1974)).

A trial court is required to explain to a jury that fresh complaint testimony is not to be considered as substantive evidence of guilt, or as bolstering the credibility of the victim and that such testimony may only be considered for the limited purpose of confirming that a complaint was made.  Bethune, 121 N.J. at

18

147-48; State v. P.H., 178 N.J. 378, 393 (2004). Jurors are presumed to follow such instructions. Nelson, 173 N.J. at 469 (citing State v. Manley, 54 N.J. 259, 270 (1969)).

Here, the trial judge's fresh complaint instruction conveyed that T.F.'s testimony was permitted for a "limited purpose," i.e., "to negate any inference that [E.T.] failed to tell anyone about the sexual offense and therefore her later assertion could not be believed." It is evident the judge's instruction in this regard was based largely on the applicable model jury charge. See Model Jury Charge (Criminal), "Fresh Complaint" (2007); see also Bethune, 121 N.J. 137. Although the judge took the liberty of adding some phrasing to the model jury charge by letting the jurors know what he said might "sound counterintuitive," he also made clear that "[a] fresh complaint is not evidence that the sexual offense actually occurred or that [E.T.] is credible . . . . It does not strengthen her credibility. It does not prove the underlying offense or the underlying truth of the sexual offense." While we acknowledge the challenged extraneous comments[4] should not have been included in the judge's fresh complaint

_____

[4] As part of his announcement to the jurors that he had inadvertently neglected to provide them with instructions on how to consider T.F.'s "fresh complaint" testimony, the judge said: "That's a big whoops." This may have been intended by the judge as nothing more than a lighthearted, innocuous comment.

A-4144-17T1

instruction, we also consider the totality of the judge's charge, including the cautionary directive that jurors should not give the fresh complaint instruction undue weight. Given the entirety of the judge's instructions, coupled with the overwhelming evidence of defendant's guilt, we are satisfied the judge's error was not "of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2.

Defendant argues in Points III and IV that if his conviction stands, his sentence must be vacated to allow him to receive concurrent five-year prison terms for his second-degree offenses. He further contends the trial court should not have found aggravating factor two applied to his endangering offenses because they already encompass this aggravating factor and should not be "double counted." Additionally, defendant argues the trial judge erred by finding aggravating factor nine, since his endangering convictions already

---

However, "a trial judge's interactions with the jury must be 'guided by a concern for the weighty role that the judge plays in the dynamics of the courtroom.'" State v. Gleaton, 446 N.J. Super. 478, 523 (App. Div. 2016) (quoting State v. Ross, 218 N.J. 130, 145 (2014)). Anything a judge says or does in a jury trial may have profound unintended consequences. Thus, this innocuous comment, coupled with the judge's characterization of the fresh complaint instructions as being "counterintuitive," may be viewed as belittling the importance of these instructions. We thus caution our colleagues at the trial level to be mindful of the Supreme Court's admonition in Ross.

"subject him to all registration and notification requirements pursuant to Megan's Law."  Again, we disagree.

Trial judges have broad sentencing discretion as long as the sentence is based on competent credible evidence and fits within the statutory framework. State v. Dalziel, 182 N.J. 494, 500 (2005).  Judges must identify and consider "any relevant aggravating and mitigating factors" that "are called to the court's attention" and "explain how they arrived at a particular sentence."  State v. Case, 220 N.J. 49, 64-65 (2014) (quoting State v. Blackmon, 202 N.J. 283, 297 (2010)).  "Appellate review of sentencing is deferential," and we therefore avoid substituting our judgment for the judgment of the trial court.  Id. at 65; State v. O'Donnell, 117 N.J. 210, 215 (1989); State v. Roth, 95 N.J. 334, 365 (1984).

Aggravating factor two "focuses on the setting of the offense itself with particular attention to any factors that rendered the victim vulnerable or incapable of resistance at the time of the crime."  State v. Lawless, 214 N.J. 594, 608 (2013).  The trial court "must engage in a pragmatic assessment of the totality of harm inflicted by the offender on the victim, to the end that defendants who purposely or recklessly inflict substantial harm receive more severe sentences than other defendants."  State v. Kromphold, 162 N.J. 345, 358 (2000).

Here, E.T. testified defendant had "said something about [fellatio] before [the incident] but this time it was different" because he persisted in his efforts to have her engage in this act.  He told her she did not have to look at him or "think of [him] as [her] dad."  Further, defendant gave E.T. an alcoholic drink, provided a password on his laptop so she could watch a pornographic movie to make herself "comfortable," and offered her marijuana.  Additionally, although E.T. did not appear at defendant's sentencing "for the sheer reason of really not wanting to see her father," she provided "bullet points" for the prosecutor to convey to the court.  Those points confirmed that E.T. was embarrassed others knew what had happened to her, was "scared of other men to some extent and the whole situation has made her depressed."

Under these circumstances, there was ample support for the sentencing judge to find aggravating factors two and nine.  Moreover, to the extent defendant argues it is impermissible to find aggravating factor nine in a Megan's Law case, he is mistaken.  See Case, 220 N.J. at 68.  Additionally, we are satisfied the sentencing judge correctly applied the sentencing guidelines enunciated in the Code when he found "the aggravating and mitigating factors are in equipoise."  Finally, the concurrent sentence imposed for defendant's

second-degree offenses does not shock our judicial conscience.  Accordingly, we discern no basis to second-guess the sentence.

Defendant's remaining arguments are without sufficient merit to warrant further discussion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4144-17T1